**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JOHN DOE 6, and JANE DOE 7,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

Defendant.

**Case No. 8:26-cv-00060-DOC-MAA**

**ORDER GRANTING PRELIMINARY INJUNCTION [13]**

This case concerns the government's decision to terminate automatic extensions of employment authorization for certain foreign nationals applying for renewal of their employment authorization documents ("EADs"). The government argues that there is a need to bypass notice-and-comment rulemaking for this regulation because of national security concerns associated with the former auto-extension policy. Plaintiffs claim that the government has a different reason for seeking to implement these regulations, and that the government has nevertheless not followed the proper procedure for implementing this policy change.

Plaintiffs argue that the real reason the government issued this rule change is to protect American workers from competition by foreign nationals. Plaintiffs additionally argue that it has become increasingly difficult for foreign nationals to obtain pathways to work and live in the United States. Plaintiffs submit that it currently takes over twenty years for someone from India to obtain a green card. Supplemental Brief (Dkt. 32) at 4-5.

Perhaps these are sound policy decisions. Perhaps they are not. Either way, a court may not set aside agency action "solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019).

Every new Administration has the right to set its own policy priorities. Indeed, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring). This is because agency decisions are "routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)." *New York*, 588 U.S. at 781.

This case, however, does not call for adjudicating the merits of the Executive Branch's immigration policy. The issue before the Court is only that the government did not follow the proper procedures under the Administrative Procedure Act. That is why this regulation fails and why the Court sets it aside as to the seven named Plaintiffs.

## I. Background

This Order concerns Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, John Doe 6, and Jane Doe 7's (collectively, "Plaintiffs") Ex Parte Application for a Temporary Restraining Order (Dkt. 13) ("Application" or "App."). On May 8, 2026, the Court converted the Application to a Motion for a Preliminary Injunction (Dkt. 26).

### A. Facts

Plaintiffs are each H4 visa holders (spouses of H1B visa holders) who are eligible to work in the United States. Complaint (Dkt. 1) ("Complaint" or "Compl.") ¶¶ 1-7. They claim that recent changes with respect to the issuance of EADs has rendered it impossible for them to legally work in the United States and indeed forced some of them out of jobs they were holding under prior authorizations. *See* Compl. at 2-3.

The Court first summarizes the history of the EADs at issue here. Spouses of H1B visa holders are admitted pursuant to an H4 visa. *Id.* ¶ 22. H4 visa holders are not automatically eligible for employment in the United States and thus must obtain EADs. *See id.* The H4 visa holder's employment authorization is tied to their spouse's immigration status. *Id.* ¶¶ 22-24.

Before 2015 there was no legal pathway for H4 visa holders to work in the United States. *Id.* ¶ 29. This meant that H4 visa holders could not work until their spouses were eligible for a green card. *Id.* This put the United States at a competitive disadvantage considering that the vast majority of H4 visa holders are highly educated individuals who have at least a Bachelor's Degree. 40% have some form of graduate degree.[1] To address this potential shortcoming, the United States Citizenship and Immigration Service ("USCIS") issued a final rule providing for employment authorization for H4 spouses. Compl. ¶¶ 30-31.

Under this initial 2015 rule, H4 visa holders could apply to extend their employment authorization up to 180 days before expiration. *Id.* ¶ 36. However, this application window necessarily rests on the H1B holder's concomitant application extension. *Id.* ¶ 37. So, if there are any delays in the H1B holder's extension application (e.g., a delay by the H1B holder's employer), that necessarily delays when the H4 visa holder may apply to extend their

[1] Madeline Zavodny, National Foundation for American Policy, *H - 4 Visa Holders: An Underutilized Source Of Skilled Workers* 7 (Nov. 2022), https://nfap.com/wp-content/uploads/2022/11/H-4-Visa-Holders.NFAP-Policy-Brief.2022-2.pdf.

employment authorization. *Id.* If the application is not processed before expiration, then the H4 visa holder would lose their employment authorization and must stop working. *Id.* ¶ 36.

Before 2019, H1B, H4, and H4 EAD extensions were all completed concurrently by the agency in relatively short order and almost all applications were completed before the expiration deadline. *Id.* ¶ 38. In 2019, the government sought to eliminate employment authorization for H4 visa spouses through the regulatory process and by issuing a new agency rule. *Id.* ¶¶ 40-41. This rule was not issued, but the government slowed the H4 EAD process by forcing H4 applicants to submit new biometrics when applying. *Id.* ¶ 43. This was even though such applicants' biometrics had been collected twice: once when applying for a visa at the U.S. consulate, and again at the port of entry when entering the U.S. *Id.* The government proffered that the recollection of biometric data was necessary to combat trafficking and smuggling. *Id.* ¶ 50. But the government had already been sharing the earlier collected biometrics for years among different departments and agencies and was successfully using it to identify individuals. *Id.* ¶¶ 51-54. The process for booking an appointment to get new biometrics collected was also nearly impossible, essentially rendering H4 EADs unobtainable. *Id.* ¶ 54.

The government also made the H4 EAD application procedure sequential. *Id.* ¶ 55. This had the effect of massively delaying H4 EAD applications—for those who were able to apply—such that processing times extended well beyond the 180-day deadline. *Id.* ¶ 57. Predictably, many H4 visa holders were forced out of work. *Id.* ¶ 56. In short, although the rule eliminating employment authorization for H4 visa holders failed, the government effectuated the same end through another route by making such extensions practically impossible. *Id.* ¶ 59.

These difficulties prompted H4 visa holders to sue. *Id.* ¶ 60. The government settled a class action lawsuit in *Edakunni v. Mayorkas*, Case No. 21-cv-393-TL (W.D. Wash., Jan. 23, 2023), that challenged the unlawful and intentional delay of EAD adjudications. As part of the settlement the government agreed to suspend the re-collection of biometrics and return to concurrent application processing. *Id.* ¶ 61. The government also issued a temporary final rule that granted EAD holders who had filed a renewal application up to 540 days of EAD auto-extension. *Id.* ¶ 62. This "auto-extension rule" was extended once and then made permanent in

December 2024. *Id.* ¶¶ 63-64. The "auto-extension rule" was very successful in preventing H4 visa holders from experiencing a gap in employment eligibility. *Id.* ¶¶ 62-64.

On November 3, 2025, the government proposed a new rule once again reinstating biometric recollection. Plaintiffs claim this is likely to once again bottleneck the system and make obtaining EADs practically impossible. *Id.* ¶ 65. The government also issued an interim final rule, "Removal of the Automatic Extension of Employment Authorization Documents," on October 30, 2025 (the "IFR") ending the "auto-extension rule." *Id.* ¶ 67. The primary justification for this interim rule is outlined below:

> [V]etting and screening might not be completed and derogatory information reviewed and resolved before the alien's EAD expires. The automatic extension, therefore, poses a security vulnerability that could allow bad actors to continue to work and generate income to potentially finance nefarious activities that pose an imminent threat to the American public. Granting benefits without proper vetting and full adjudication is contrary to the mission of DHS and poses a threat to the safety and security of the American people. 90 Fed. Reg. 48799-01, 48806.

The government cites one example in support of justification for the interim rule:

> The need to conduct complete and thorough vetting of applicants for renewal EADs to mitigate potential risks to public safety and national security became abundantly clear on June 1, 2025, when an alien firebombed and assaulted demonstrators at a peaceful Jewish event to support hostages in Gaza. The alien threw Molotov cocktails that burned multiple victims, and his attack injured 15 people. The alien had entered the United States in August 2022 and remained in the United States beyond the expiration of his nonimmigrant status. He applied for asylum in September 2022, and that application was still pending at the time of the attack. He also obtained an EAD based on a pending asylum application which was then automatically extended for a period of up to 540 days. This attack by an alien against peaceful demonstrators highlights the critical need and urgency to ensure that aliens are not provided immigration benefits in the United States without thorough vetting and more frequent determinations of continued eligibility and, when applicable, determinations that the alien continues to merit a favorable exercise of discretion. *Id.* at 48808.

The IFR also stated that the government recognized the difference between various EAD categories (i.e., that the security threat will depend on the circumstances of the applicant) but concluded that a "uniform approach" was best because it "avoids the potential for confusion among the regulated public, particularly employers who must comply with Form I-9 employment eligibility verification paperwork requirements or face potential adverse consequences, including possible civil or criminal penalties depending on the nature and extent of the violation(s)" and "it also advances the goal of providing a comprehensive policy solution and administrative simplicity." *Id.* at 48807. The government bypassed the notice-and-comment period for the IFR and made it effective immediately, reasoning that "[t]he attack by an alien against peaceful demonstrators in Boulder, Colorado, highlights the critical and urgent need to act to mitigate the immediate risk posed to innocent Americans." *Id.* at 48813. The government also claimed that such emergency measures were necessary to prevent aliens from rushing to file EAD applications during the notice-and-comment period. *Id.* The government acknowledged that it had considered returning to an 180-day auto-extension rule or delaying the implementation of the IFR, but concluded that neither of these alternatives address the immediate need to vet reapplicants before authorizing them to work. *Id.* at 48810.

Plaintiffs claim that the government's justifications behind the IFR are pretextual and false. Compl. ¶¶ 77-80. In fact, Plaintiffs claim that the government has the capability to screen and vet immigrants on H4 visas continuously and that any screening and vetting through the EAD process is superfluous. *Id.* ¶¶ 77-81. Plaintiffs cite to two separate systems available to the government for vetting EAD applicants continuously rather than through a point-in-time process triggered by the filing of an EAD application. *Id.* The first system, called ATLAS, is able to perform point-in-time checks but also continuously conducts automated checks where any "hits" are automatically forwarded to the correct government agency for further investigation and action. *Id.* ¶ 85. The Continuous Immigration Vetting ("CIV") program also allows for continuous checks as an "event-based vetting tool that automates and streamlines the process of notifying USCIS of potential derogatory information in Government databases that

may relate to individuals in USCIS systems, as new information is discovered."[2] Plaintiffs claim that CIV provides an interagency system configured to monitor for "hits" on immigrants, which are then forwarded to agency staff called "Gatekeepers" to evaluate any necessary action. Compl. ¶ 87. A former agent for ICE and its agency predecessors filed a comment on the IFR also expressing that the government can continuously vet H4 EAD applicants, thus rendering the sought purpose for the IFR unnecessary. Mot., Ex. 1 (Dkt. 13-3).

Plaintiffs are all H4 visa holders who have or have had valid EADs. Compl. ¶¶ 92-105. Their EADs have either already expired or will expire sometime in the near future. *Id.*

### B. Procedural History

On January 8, 2026, Plaintiffs filed their Complaint (Dkt. 1) in this Court. Plaintiffs bring one claim for violation of the Administrative Procedure Act ("APA"). Compl. ¶¶ 119-28.

A month later on February 13, 2026, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order (Dkt. 13). On May 8, 2026, "[a]fter consideration, the Court conclude[d] that it should not decide the Application on an ex parte basis" and the Court converted the Application to a Motion for a Preliminary Injunction and ordered a briefing schedule (Dkt. 26). Defendant filed its Opposition ("Opp.") to the Motion for a Preliminary Injunction on May 28, 2026 (Dkt. 29). Plaintiffs then filed their Reply ("Reply") on June 4, 2026 (Dkt. 30).

The Court heard oral argument on June 24, 2026. Following oral argument, the government submitted a filing providing more details about the Colorado incident discussed at oral argument (Dkt. 33). Plaintiffs also filed a supplemental brief summarizing the delays that those seeking to work or live in the United States might experience (Dkt. 32). Neither party has elected to respond to the other's post-argument filing.

Finally, this Court signed and filed an Order Prohibiting Adverse Immigration Action Against Named Plaintiffs (Dkt. 35) on June 26, 2026. This mooted Plaintiffs' Motion to Proceed Under Pseudonyms (Dkt. 14).

---

[2] U.S. Dep't Homeland Sec., *Privacy Impact Assessment for the Continuous Immigration Vetting* (Feb. 14, 2019), https://www.dhs.gov/sites/default/files/publications/pia-uscis-fdnsciv-february2019_0.pdf.

## II. Legal Standard

### A. Injunctive relief.

A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### B. The Administrative Procedure Act.

Under the Administrative Procedure Act ("APA"), "courts, not agencies, will decide all relevant questions of law arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) (internal quotation marks and emphasis omitted). For agency policymaking and factfinding, the APA authorizes a court to "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Native Ecosystems Council v. Marten*, 883 F.3d 783, 788 (9th Cir. 2018). Agency action is arbitrary and capricious if the administrative record demonstrates that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (1983).

**III. Discussion**

First, Defendant argues that "Plaintiffs' Motion should be denied because it impermissibly seeks mandatory, permanent injunctive relief 'on the merits.'" Opp. at 3. Plaintiffs counter that "[f]ar from being a disfavored mandatory injunction, the pending motion requests the Court follow the law exactly as it was envisioned by Congress." Reply at 1. The Court agrees with Plaintiffs. Defendant promulgated a new agency rule through the good-cause emergency exception bypassing any opportunity for Plaintiffs to comment or be heard before the rule's issuance. It would be unfair to now deny Plaintiffs the opportunity for emergency relief when they had no prior opportunity to challenge the rule. Furthermore, Defendant has had the opportunity to litigate this issue now through its briefing and at oral argument, and the issue before the Court—whether the rule violates the APA—is almost entirely legal with no need for further factual development. There is no need to delay resolution of this issue.

Defendant also argues that the Court lacks subject matter jurisdiction over Plaintiffs' claims under 8 U.S.C. section 1252(a)(2)(B). Opp. at 11-15. That statute provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

This argument misses the mark. Plaintiffs here challenge an agency regulation promulgated under the APA. The court cannot adopt a reading of 8 U.S.C. section 1252(a)(2)(B) that would foreclose judicial review of regulations relating to immigration. This would essentially render the APA inapplicable to a massive swath of administrative law.

The issue here is also not the exercise of the "Secretary's discretion," Opp. at 13, but the government's exercise of an emergency exception to bypass notice-and-comment rulemaking. This Court has previously rejected the government's efforts to expand the scope of 8 U.S.C. section 1252(a)(2)(B), and it similarly rejects such efforts here. *See* Order (Dkt. 28), *Gogate v. Edlow*, Case No. 8:25-cv-02558-DOC-KES (June 5, 2026 C.D. Cal.) (noting how "another court in the Ninth Circuit canvassed other recent district court opinions and concluded that the majority of courts to face this question have concluded that 8 U.S.C. section 1252(a)(2)(B) does not bar pace-of-adjudication claims like Plaintiffs'" (citing *Concepcion v. Mullin*, No. 25-CV-03221-DMS-MMP, 2026 WL 1388761, at *4-12 (S.D. Cal. May 18, 2026)).

The Court now proceeds with an analysis of each of the *Winter* factors for the Application.

**A. Plaintiffs have established a likelihood of success on the merits.**

The first *Winter* factor is "the most important factor" in assessing whether injunctive relief should be granted. *Env't Prot. Info. Ctr. v. Carlson,* 968 F.3d 985, 989 (9th Cir. 2020). Here, the Court finds Plaintiffs has established a likelihood of success on the merits.

**1. The government has not properly invoked the good-cause exception.**

First, Plaintiffs claim that Defendant has failed to adequately exercise the good-cause exception and that it cannot be used to pass the IFR. "Proper invocation of the good-cause exception is 'sensitive to the totality of the factors at play.'" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 675 (9th Cir. 2021) (hereafter, "*E. Bay II*") (quoting *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010)). This "exception is a 'high bar' because it is 'essentially an emergency procedure.'" *E. Bay Sanctuary Covenant*, 993 F.3d at 675 (quoting *Valverde*, 628 F.3d at 1164). The government may meet this threshold in two different manners. First, the government may "make a sufficient showing that 'delay would do real harm

to life, property, or public safety.'" *E. Bay II*, 993 F.3d at 675 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 777 (9th Cir. 2018) (hereafter, "*E. Bay I*"). Alternatively, the government may make an adequate showing that "'some exigency' interferes with its ability to carry out its mission." *E. Bay II*, 993 F.3d at 675 (quoting *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003)).

Defendant offers two primary theories in support of its emergency justification. First, it claims that there are exigent circumstances under a "midnight rush" theory. According to the government, "[i]f DHS were to announce the rulemaking, it is self-evident that aliens would rush to file renewal EAD applications to obtain automatic extensions before the rule takes effect" and that "[m]ore aliens would thus obtain up to 540-day automatic extension without the proper vetting and determination by USCIS that the alien continues to be eligible." 90 Fed. Reg. at 48813; *see* Opp. at 5 ("[A]liens would have rushed to file renewal EAD applications to obtain automatic extensions before the rule took effect.").

Plaintiffs argue that this theory of exigency was rejected by the Ninth Circuit in a series of cases related to immigration policies from the first Trump administration. The government sought to justify its use of the good-cause exception by claiming that providing time for a notice-and-comment period "would 'create an incentive for aliens to seek to cross the border' during the notice-and-comment period." *E. Bay I* at 777 (quoting *Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661, 55950 (Nov. 9, 2018)). In a 2018 opinion, the Ninth Circuit acknowledged that "theoretically, an announcement of a proposed rule 'creates an incentive' for those affected to act 'prior to a final administrative determination.'" *E. Bay I* at 777 (quoting *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985)). However, the Ninth Circuit concluded that "[a]bsent additional evidence, [the government's] inference is too difficult to credit" and thus "the Government's reasoning is only speculative at this juncture." *E. Bay I* at 777-78. In 2021, the Ninth Circuit provided its frame of mind in stronger terms:

> Even if it did, that "the very announcement of [the] proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare," Reply Br. of Gov't at 21, is likely

> often, or even always true. The lag period before any regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception. Because the government has failed to demonstrate the existence of an exigency justifying good cause, we hold that the Rule likely does not properly fall under the good cause exception. *E. Bay II*, 993 F.3d at 676 (9th Cir. 2021).

Here, the Court agrees that the government seeks to once again advance the same "midnight rush" theory that was rejected by the Ninth Circuit in the *East Bay* series of cases. Accordingly, this "midnight rush" theory cannot provide justification for the good-cause exception.

Second, the government claims that bad actors could use their earnings from gainful employment to support criminal or terrorist actors. The government cites a single incident where an asylum applicant threw a Molotov cocktail while on an EAD auto-extension. IFR, 90 Fed. Reg. at 48813. The Court finds that the Ninth Circuit's *East Bay* cases also resolve this issue. There, in support of its reliance on the good-cause exception, the government cited "a *Washington Post* article indicating that when the United States stopped its policy of separating migrant parents from their children, smugglers told asylum-seekers that 'the Americans do not jail parents who bring children—and to hurry up before they might start doing so again.'" *E. Bay II* at 675 (quoting Nick Miroff and Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, Wash. Post (Oct. 24, 2018)).

The Ninth Circuit concluded that "[a] citation to this single article is not sufficient to demonstrate that the delay caused by notice-and-comment or the grace period might do harm to life, property, or public safety" and thus "[t]he government's reasoning continues to be largely speculative [because] no evidence has been offered to suggest that any of its predictions are rationally likely to be true." *E. Bay II*, 993 F.3d at 676. So too does this reasoning apply to the instant Molotov cocktail incident. A one-off event does not justify the use of the good-cause without further reasoning or justification. The government's example also ignores a basic

premise. The issue in the Molotov cocktail incident is not that the individual had authorization to work in the United States, it is that the person was in the United States and had access to a dangerous weapon. There is no logical connection between the person's work authorization and their Molotov-throwing behavior.[3]

At oral argument, the government argued that the IFR extends beyond this single Colorado incident. The government also suggested that EAD holders may use the income from their work in the United States to support nefarious activities. However, the government has failed to identify any other example that supports an urgent security need for the IFR. This lack of supporting evidence reveals the weakness of this theory.

Defendant argues in its Opposition that "DHS provided ample explanations why this prong was met, outlining the significant security vulnerabilities that currently exist in the United States and how the up to 540-day automatic extension of an EAD grants the benefits of extending an alien's expired EAD—a secure document that allows, for example, aliens to access secure facilities, such as airports—without determining continued eligibility, without resolving potential hits of derogatory information, and without determining that the employment authorization should be granted in the exercise of discretion, when applicable." Opp. at 4-5. However, this argument fails to remedy the issues with the Molotov cocktail example pointed out above. If an EAD applicant is a national security threat, the issue is that they are able to *live in* the United States, not that they are able to *work in* the United States. The IFR does nothing to eliminate the former concern. Furthermore, airport terminals are thoroughly screened by the Transportation Security Administration, and anyone can walk into an unsecured part of the airport without presenting documentation.

**2. The government cannot rely on the "foreign affair function" exception.**

In its Opposition, the government also argues that "DHS permissibly invoked the foreign affairs exception to notice-and-comment rulemaking." Opp. at 6. This exception applies "to the extent that there is involved . . . [a] foreign affairs function of the United States." The

[3] The Court has reviewed the government's post-argument filing (Dkt. 33) regarding the Colorado incident and concludes that it also offers no allegations or evidence connecting the perpetrator's work authorization to their capability to carry out the attack.

government contends that the exception applies because "the grant of employment authorization and/or EADs is inherent to the control of an alien's status, and affects the transfer of goods, including money, across the U.S. border." Plaintiffs counter that "[t]his claim ignores the fact that a nonimmigrant's status is entirely separate and distinct from their employment eligibility." Reply at 3. The Court agrees with Plaintiffs. This case only concerns Plaintiff's employment eligibility *within the United States*. The government's argument stretches too far.

For the foreign affairs exception to apply, "the public rulemaking provisions should provoke definitely undesirable international consequences." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). At oral argument, the government argued that by working in the United States, EAD holders may obtain money flowing across international borders. But the mere fact that some of the money EAD holders earn flows across international borders is not enough for the foreign affairs exception to apply. By this logic, the government could bypass notice-and-comment for a rule affecting American citizens because their wages have occasionally touched international borders as well. That threshold has not been met here and so the government's "foreign affairs function" argument fails just as in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676-77 (9th Cir. 2021).

**3. The government has failed to explain why the rule is needed in light of its vetting capabilities.**

An agency must provide a "'rational connection between the facts found and the choice made' to promulgate [an] interim rule on an emergency basis." *United States v. Valverde*, 628 F.3d 1159, 1168 (9th Cir. 2010) (quoting *Natural Res. Def. Council, Inc. v. U.S. E.P.A.*, 966 F.2d 1292, 1297 (9th Cir.1992)). This means "[a]s the APA requires that agencies engage in reasoned decisionmaking, the agency ha[s] an obligation to consider its other obligations and any alternatives, even if it could properly end up rejecting them." *State v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) (quoting *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020)). The "agency's obligation to consider alternatives 'is well settled' and includes 'a duty to give a reasoned explanation for its rejection of such alternatives.'" *Su*, 121 F.4th at 17 (internal omissions omitted) (quoting *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169

(D.C. Cir. 1987)). "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *California v. Bernhardt*, 472 F. Supp. 3d 573, 608 n.22 (N.D. Cal. 2020) (quoting *Yakima Valley Cablevision, Inc. v. F.C.C.*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986)).

Here, the government has proffered that its emergency rule is necessary to prevent bad actors from working in the United States without vetting. This characterization is incomplete, however, as it ignores the government's continuous vetting capabilities through programs like ATLAS and CIV. The government's reasoning fails to explain why these systems are insufficient for vetting EAD applicants, and why vetting at the ED stage is necessary. "Judges are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). There are clearly vetting alternatives to the IFR, but the government failed to consider them. Perhaps the IFR has benefits over these alternatives that would still justify its issuance. The government, however, is required to go through this step to demonstrate the propriety of its rulemaking process.

The government argues in its Opposition that "Plaintiffs' arguments [regarding the government's continuous vetting capabilities] amount to mere policy disagreements, and DHS has properly weighed relevant policy interests and determined that continuing to provide automatic extensions of employment authorization is inconsistent with overarching policy concerns." Opp. at 8. Again, this argument overlooks a crucial premise: Plaintiffs already have authority to reside in the United States. If the government believes that they are not properly being vetted, then it has failed to explain why those concerns should be addressed at the employment authorization stage, especially considering its continuous vetting capabilities.

**4. In light of the issues with the rulemaking, the government has failed to show that it adequately considered the reliance interests of people like Plaintiffs.**

Agencies are "free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Thakur v. Trump*, 148 F.4th 1096, 1106 (9th Cir. 2025) (quoting *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 569 (2025)).

Here, Plaintiffs are all EAD holders who face a lapse in their ability to work in the United States due to the IFR. *See* App. at 20-22. Plaintiffs argue that the government failed to consider these reliance interests. *Id.* at 22. But this is not entirely accurate. The government acknowledges in the IFR that "the current regulatory and policy framework involving renewal EAD applications and automatic extensions may have engendered reliance interests" for "[a]liens, their families, and employers [who] may have relied on the automatic extensions to maintain the alien's continuous employment authorization and/or EADs and to avoid lapses in employment authorization that may be detrimental to the alien, their family's finances, and their employer's operations." IFR, 90 Fed. Reg. at 48809. Despite acknowledging these reliance interests, the government ultimately chose to proceed with the IFR. In so doing, the government ignored its continuous vetting capabilities through programs like ATLAS and CIV, thereby discounting the reliance interests by ignoring clear alternatives that could mitigate the harm to EAD holders. In short, the government may have acknowledged the serious reliance interests at play, but it is evident they were not a factor in the rulemaking process.

**B. Without injunctive relief, Plaintiffs will suffer irreparable harm.**

The Court finds Plaintiffs have shown risk of irreparable harm. "Irreparable harm is 'harm for which there is no adequate legal remedy, such as an award for damages.'" *E. Bay II*, 993 F.3d at 677 (citation omitted). "In the APA context, economic harms may be irreparable because plaintiffs are otherwise unable to recover monetary damages." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020). Here, Plaintiffs face an extended lapse in employment. The harm from this lapse extends beyond the loss of wages. This lapse will prevent Plaintiffs from progressing in their careers and constrain their future earning potential. It may also signal to other employers that EAD holders present a risk of losing eligibility and inhibit Plaintiffs' future employability.

**C. The balance of hardships and public interest is in Plaintiffs' favor.**

The last two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court finds that the balance of equities and public interest factors favors Plaintiffs. "[T]he public interest is served by compliance with the APA"

and it "does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *E. Bay II*, 993 F.3d at 678 (citation omitted). The government failed to comply with the APA in enacting the IFR, so this points toward the third and fourth factors tipping in Plaintiffs' favor.

H4 visa holders are generally highly-educated. It is reasonable to conclude that they will contribute positively to society if allowed to work. Plaintiffs have also already been vetted at least once, and the government can continuously vet them through programs like ATLAS and CIV. Forcing such individuals to endure lapses in employment is not in the public interest.

For these reasons, the Court concludes that the balance of hardships and public interest tips sharply in favor of Plaintiffs.

## IV. Disposition

For the foregoing reasons, the Court **GRANTS** the Motion for a Preliminary Injunction (Dkt. 13).

The Court hereby **ORDERS** that, as to the SEVEN (7) Plaintiffs, Defendant's October 30, 2025 interim final rule published at 90 Fed. Reg. 48799 is immediately set aside. The government may effectuate this by providing EADs to Plaintiffs that are effective throughout the pendency of this case.

The Court also certifies this matter for appeal under 28 U.S.C. section 1292(b) and any other applicable statute or regulation. The Court here has elected not to issue a nationwide injunction and instead grant relief only as to the named Plaintiffs. It does so because this case raises mostly legal issues regarding the implementation of government regulations and these issues are ripe for appeal. The Court hopes that an appellate court will be given the opportunity to assess this issue without the need for a prior nationwide injunction. The Court anticipates that Plaintiffs may reinvigorate their request for a nationwide injunction if the government ultimately elects not to appeal this Order. If this comes to pass, the Court can entertain the request understanding that the government has declined an earlier opportunity to appeal.

**IT IS SO ORDERED.**

DATED: September 10, 2026

[signature]

Hon. David O. Carter, District Judge